Filed 4/22/22

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>            v.<br><br>CHRISTIAN BIRDSALL,<br><br>    Defendant and Appellant. | A159555<br><br>(Alameda County Super. Ct.<br>No. H54947A) |

A jury convicted defendant Christian Birdsall of the first degree murder of Barbara Latiolais (Pen. Code,[1] § 187, subd. (a)) and arson of an inhabited structure (§ 451, subd. (b)). As to the murder charge, the jury found three special-circumstance allegations to be true—that the murder was committed by means of lying in wait and during a robbery and a burglary (§ 190.2, subd. (a)(15), (17)(A), (G)). The trial court sentenced Birdsall, who was 16 years old at the time of the crime, to life imprisonment without the possibility of parole (LWOP) for the murder, plus a consecutive five-year term for arson.

In this appeal (his second, after we conditionally reversed the judgment and remanded for a juvenile court transfer hearing) (see *People v. Birdsall*

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A., II.B., and II.D.

[1] Undesignated statutory references are to the Penal Code.

(Nov. 30, 2018, A146666) [nonpub. opn.]), Birdsall contends the court erred by failing to suppress inculpatory statements he made to police, which he argues were obtained in violation of *Miranda*[2] and were involuntary. He also presents several challenges to his sentence on constitutional and other grounds. Finally, in a supplemental brief, Birdsall claims that, in light of recent legislation revising the law of murder, one of the court's instructions to the jury was prejudicially erroneous.

In the unpublished portion of this opinion, we conclude the court properly admitted Birdsall's statements to police, and we reject Birdsall's challenges to his sentence. In the published portion of the opinion, we conclude the alleged instructional error was harmless. We therefore affirm.

## I. BACKGROUND

On October 17, 2012, Birdsall and a friend, Cody Nicosia, murdered Barbara Latiolais in her home and stole numerous items, including a car. Birdsall, who had a distant family relationship with the victim and had done work at her home, knew her partner Mike Rice would be out of town. Birdsall thought Latiolais might also go out of town on a separate trip. Birdsall proposed a plan to burgle the house, and Nicosia agreed to participate.

Birdsall and Nicosia hid outside the house for several hours, first in the yard and then under the front deck, but when Latiolais did not leave, they decided to kill her and proceed with the planned burglary. Birdsall later told police that he suggested they leave but Nicosia insisted they go through with the crime because they had come that far and were "kind of trapped." Birdsall said, "okay." Birdsall told the officers: "I should've just said, let's go. I let the greed get to me."

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

2

Birdsall went to the front door of the house and asked Latiolais if he could do some work. She agreed and let him in. Nicosia entered at the back of the house. Once inside, Birdsall and Nicosia attacked Latiolais and strangled her using chokeholds. They believed she was dead, but she began making sounds, so Nicosia attempted unsuccessfully to break her neck. Nicosia then got a rope from the garage, wrapped it twice around Latiolais's neck, and he and Birdsall pulled on the two ends of the rope until she stopped making sounds. They then broke into a closet and a safe using an ax from the garage, took several guns as well as jewelry, marijuana, and coins, loaded the items into Rice's Volvo, and drove away.

Several hours later, after having dinner with friends and showing them the guns, Birdsall and Nicosia decided to return to the house to cover up evidence. They went back to the house and, using containers of gasoline they found there, set the house on fire. Firefighters responding to the blaze in the early morning hours of October 18, 2012, found Latiolais's body inside the house.

On October 25, 2012, police arrested and interrogated Birdsall, who made inculpatory statements about his planning of and participation in the crimes. Video recordings of the interrogation were admitted into evidence and played for the jury at Birdsall's trial.

Birdsall was charged in adult criminal court with murder (count one) and arson (count two), as well as special circumstance allegations in connection with count one.[3] At his trial in 2015, he presented a mental state defense. Dr. Ricardo Winkel, a psychologist, testified that Birdsall, who was

---

[3] Nicosia was charged with the same offenses and allegations and was tried separately. In his appellate brief, Birdsall states Nicosia was convicted and sentenced to LWOP.

a special education student since the second grade, had attention deficit hyperactivity disorder (ADHD), an auditory processing deficit that makes it difficult to process or understand things he hears, and deficits in working memory. Also, due to trauma from childhood neglect and abuse, including sexual abuse by a neighbor, he suffered from severe posttraumatic stress disorder. He was severely depressed.

Dr. Winkel testified that a prominent feature of Birdsall's psychology was a tendency to dissociate under stress, i.e., "to disconnect from the situation or from . . . feelings [or] thoughts he himself may have." Dr. Winkel opined Birdsall's behavior at the time of and after the crimes was consistent with his being in a dissociated state and in denial. In particular, it was highly probable the stressful situation created when Nicosia insisted they had to go through with the crimes caused Birdsall to dissociate. Frequently, a person who dissociates during a stressful event can later remember what happened. Defense counsel argued to the jury that Birdsall was in a dissociated state at the time of the crime and did not form the required mental states for conviction.

The jury found Birdsall guilty of first degree murder and arson, and found true the alleged special circumstances that the murder was perpetrated by means of lying in wait and during a robbery and a burglary. At sentencing in September 2015, the trial court (Hon. Jon R. Rolefson) sentenced Birdsall to LWOP for the murder conviction, plus a consecutive five-year term for arson.

Birdsall appealed, raising several challenges to his conviction and sentence. (*People v. Birdsall*, *supra*, A146666.) In November 2018, we conditionally reversed the judgment based on the retroactive application of Proposition 57, which requires that a transfer hearing be held in juvenile

4

court prior to the initiation of adult criminal court proceedings against a minor. (*People v. Birdsall, supra,* A146666.) We remanded the case to the juvenile court to hold a transfer hearing and determine whether Birdsall's case should proceed in juvenile or adult court. (*Ibid.*) We directed that, if the court found Birdsall unsuitable for juvenile court adjudication, it should reinstate the judgment, subject to the right of the parties to appeal the reinstated judgment. (*Ibid.*) We did not reach Birdsall's other appellate arguments. (*Ibid.*)

In January 2020, after conducting a transfer hearing in December 2019, the juvenile court (Hon. Rhonda Burgess) found Birdsall was not suitable for juvenile court adjudication. Pursuant to this court's directive in remanding the case, the juvenile court reinstated the original judgment, subject to the right of the parties to appeal. Birdsall then initiated the present appeal (A159555) challenging his reinstated conviction and sentence.[4]

## II. DISCUSSION

### A. *The Motion To Suppress*

#### 1. Background

Before trial, Birdsall moved to suppress the statements he made to police, and the court (Judge Rolefson) held an evidentiary hearing on the motion, where there was evidence of the following chain of events.[5] On October 22, 2012, Birdsall told a teacher at his high school that he was going

---

[4] Birdsall also filed a writ petition (No. A160201) challenging the juvenile court's ruling at the transfer hearing. This court denied that petition in September 2020.

[5] At the suppression hearing, in addition to receiving testimony, the court admitted as an exhibit the video recording of the October 25, 2012 interview of Birdsall at the Sheriff's Department substation.

through a hard time and that his aunt had died and her house had burned down. Birdsall said he had been "5150'd" the summer before, indicating a psychiatric issue, and that he was beginning to feel that way again. The teacher notified the principal of the conversation.

Former Sergeant David Dickson of the Alameda County Sheriff's Department testified that he received information that Birdsall was having psychological issues. On October 23, 2012, he conducted a 7- to 10-minute interview of Birdsall pursuant to Welfare and Institutions Code section 5150 in the school principal's office, with the principal and the school's resource officer, Alameda County Sheriff's Deputy Timothy Vales. Birdsall seemed a normal 16 year old, had a pleasant demeanor, and laughed a lot. At the end of the interview, Sergeant Dickson concluded Birdsall was not going to hurt himself or others. No questions were asked about the murder.[6]

On October 25, 2012, Deputy Vales arrested Birdsall at the school and drove him to the Sheriff's Department substation. The two engaged in small talk on the five-minute drive. Deputy Vales testified he did not question Birdsall about the murder. Deputy Vales also testified that Birdsall did not ask to phone his mother and did not ask for an attorney.

At the station, Birdsall was taken directly to an interview room. Sergeant Dickson testified this was done because the detectives knew they were going to interview Birdsall, and so that a video recording device could

---

[6] At the conclusion of the suppression hearing, the trial court ruled the meeting at the school on October 23 was not a custodial interrogation triggering the need for *Miranda* warnings. Birdsall does not challenge this ruling.

record Birdsall the whole time he was there. Birdsall was placed in the interview room at about 9:58 a.m.[7]

Sergeant Dickson and Detective Gus Mora entered the room about 20 minutes later and began speaking with Birdsall at around 10:19 a.m. As discussed further below, the detectives spent about five minutes asking about Birdsall's personal information such as his height and weight and engaging in small talk.

When Dickson asked Birdsall whether he knew "what this is about," Birdsall said he knew it was about "the murder," and that his mother had told him he might be questioned. Mora then said that, before they could discuss that, he needed to read Birdsall his rights. Mora read the *Miranda* warnings from a form and asked Birdsall if he understood them. After each warning, Birdsall replied, "Yes."[8] The warnings were given at about 10:23 a.m.

The detectives (primarily Mora) then began questioning Birdsall about the crime, and he initially did not admit to being involved. Mora stated the detectives had been investigating and had been speaking with Nicosia, who

---

[7] The time stamp in the video recording of the interview is 21 minutes behind the actual time. Times mentioned in this opinion are the actual times.

[8] The transcript of this portion of the recorded interview states: "[Mora]: [Y]ou have the r-right to remain silent. Do you understand that? [¶] [Birdsall]: Mm-hm. [¶] [Dickson]: Is that a yes? [¶] [Birdsall]: Yes. [¶] [Dickson]: Okay. [¶] [Mora]: Anything you say can and will be used against you in a court, uh, in a court of law. Do you understand that? [¶] [Birdsall]: Yes. [¶] [Mora]: You have the right to talk to a lawyer and have him present while you're being questioned. Do you understand that? [¶] [Birdsall]: Yes. [¶] [Mora]: If you cannot afford to hire a lawyer one will be appointed to represent you free of charge before any questioning if you wish one. [¶] [Birdsall]: Yes. [¶] [Mora]: Do you understand that? Okay, so I read your rights."

was in another interview room.  At about 10:31 a.m. (about eight minutes after the *Miranda* warnings were given), Dickson said, "I hate to butt in? [¶] . . . [¶] What my detective's trying to tell you, we got this shit figured out. So you might want to tell him the truth."

After some brief further discussion, including Mora's statement that "we all make mistakes," Birdsall asked if he could "see what Cody [Nicosia] said first."  Dickson said, "Cody's tellin' the truth.  [¶] . . . [¶] And that's what we need you to do, Chris, tell the truth."  Mora added that some of Birdsall's other friends were telling the truth "[a]nd it's best for you to tell the truth, right?  Uh, your family's concerned.  They, uh, they want you to tell the truth."  Dickson stated, "And we know it's bothering you.  We know it was bothering you the other day when you were talking to your teachers and telling them you were having nightmares and seeing your aunt's face.  Just go ahead and tell us what happened, Chris."

Birdsall then admitted his involvement in the burglary and the murder, as detailed in part I. above.  He began to do so at around 10:33 a.m., about 10 minutes after the *Miranda* warnings were given.  Over the next several hours, the detectives questioned him in detail about the crimes, with a number of breaks.  Birdsall was at the substation for eight or nine hours and was questioned for about four hours.

At some point in the morning, Deputy Vales telephoned Birdsall's mother, Mindy Birdsall, and told her Birdsall was in custody and was safe. Mindy Birdsall testified that she went to the station, where she told officers she wanted to see Birdsall, but they would not let her see him.  After speaking with an attorney, Mindy Birdsall told Sergeant Dickson she wanted him to stop questioning Birdsall, but he declined to do so.

8

The officers testified that, during his arrest and interrogation on October 25, 2012, Birdsall did not ask to speak with his mother or an attorney, and no such request is depicted on the video recording of the interview room. At the suppression hearing, Birdsall testified he did ask to speak with his mother while in the car with Vales on the drive to the station, and on multiple occasions when he was at the station but outside the interview room while being taken to or from the bathroom.

Dr. Winkel (who later testified at trial; see pt. I., *ante*), testified at the suppression hearing and opined that Birdsall, because of his auditory processing disorder, ADHD, and cognitive memory deficit, would have had difficulty understanding the *Miranda* warnings. Birdsall himself testified he did not understand the warnings, but he also testified he did not recall the *Miranda* admonition at all.

The trial court denied Birdsall's motion to suppress, concluding Birdsall was properly advised of his *Miranda* rights and that he knowingly, intelligently and voluntarily waived his rights and spoke with the officers. As to voluntariness, the court found the officers did nothing improper to overcome Birdsall's free will. The court also concluded Birdsall understood his rights and knowingly and intelligently waived them. Based on its viewing of the video recording, the court concluded Birdsall had no difficulty interacting with the officers. He gave appropriate answers, was consistently responsive and engaging, and corrected one of the officers at one point, showing he was listening and thinking about what they said. The court stated that everything it observed on the video recording indicated Birdsall understood what was being said to him during the admonitions, and he acknowledged he understood each one.

9

The court discounted Birdsall's testimony that he did not understand the warnings, in light of his other testimony that he did not recall the admonition at all. The court also discounted the credibility of Birdsall's testimony that he repeatedly asked to call his mother during the times he was not being video recorded, since there was no reference to such requests on the video recording. The court found Dr. Winkel to be an impressive witness but stated he lost some credibility when he opined that Birdsall was not capable of understanding the *Miranda* warnings. The court concluded that, based on the totality of the circumstances, there was no basis for suppressing Birdsall's statements.

### 2. Analysis

Birdsall contends the court erred by admitting into evidence the statements he made to police at the station on October 25, 2012.[9] He argues (1) the statements were obtained in violation of *Miranda*, in part because he did not knowingly and voluntarily waive his *Miranda* rights, and (2) the statements themselves were involuntary.

" '[C]ourts apply a "totality of circumstances" test to determine the voluntariness of a confession. [Citations.] Among the factors to be considered are " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " . . . In determining whether a confession was voluntary, "[t]he question is whether defendant's choice to confess was not 'essentially free' because his will was overborne." ' " (*People v. Boyette* (2002) 29 Cal.4th 381, 411 (*Boyette*).) As to a waiver of *Miranda* rights, we similarly

_____

[9] It is undisputed that, during the October 25 interrogation at the station, Birdsall was in custody for purposes of *Miranda*.

10

inquire " 'into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.' Because defendant is a minor, the required inquiry 'includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.' " (*People v. Lessie* (2010) 47 Cal.4th 1152, 1169 (*Lessie*).)

On appeal, we accept the trial court's factual findings if supported by substantial evidence, but we independently determine whether the challenged statements were voluntary or were obtained in violation of *Miranda.* (*Boyette*, *supra*, 29 Cal.4th at p. 411; *Lessie*, *supra*, 47 Cal.4th at p. 1169.) The prosecution bears the burden of proving, by a preponderance of the evidence, the voluntariness of a confession (*Boyette*, *supra*, at p. 411) and the validity of a challenged *Miranda* waiver (*Lessie*, *supra*, at p. 1169).

After considering the totality of the circumstances, we conclude Birdsall's statements were voluntary and were not obtained in violation of *Miranda.* As to *Miranda*, Detective Mora gave Birdsall the four required warnings—Mora told Birdsall that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to have an attorney present during questioning, and that if he could not afford an attorney one would be appointed for him by the court before questioning if he so desired. (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1085–1086 [listing the warnings required by *Miranda*] (*McCurdy*).) Birdsall said he understood his rights and then spoke with the officers.

While Birdsall did not expressly waive his rights before speaking, we conclude the record establishes a valid implied waiver. "Where the

11

prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 (*Berghuis*); accord, *People v. Krebs* (2019) 8 Cal.5th 265, 302 (*Krebs*).) The waiver must be both knowing and voluntary, and "[t]he waiver inquiry" thus " 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " (*Berghuis*, at pp. 382–383.) We conclude these conditions were met here—Birdsall understood the *Miranda* warnings and the rights he was waiving, and both his waiver and his statement were voluntary.

### a. *Birdsall's Prewarning Statements*

Before turning to the parties' principal arguments on these points, we address Birdsall's contention that the officers violated *Miranda* by starting to question him *before* giving the *Miranda* warnings. Before giving the warnings, Detective Mora and Sergeant Dickson spent about five minutes asking Birdsall preliminary questions, mostly about his "personal info" (his name, date of birth, height, weight, where he lived, what school he attended, and where he worked) as well as some "chitchat." Sergeant Dickson testified at the suppression hearing that the purpose of this questioning was to assess Birdsall's state of mind. Sergeant Dickson stated that, based on these interactions, he did not have any reason to believe Birdsall was having difficulty understanding the officers' questions or words. Birdsall showed no signs of being under the influence of alcohol or drugs; he did not advise the officers of any mental or physical impairments; and he showed no signs of pain or discomfort.

12

After these questions, Detective Mora stated there was an ongoing investigation and mentioned that Sergeant Dickson had met with Birdsall at his school two days earlier. Sergeant Dickson then asked Birdsall if he had expected to see Dickson again; Birdsall replied, "No, I didn't"; and Dickson asked if Birdsall had "any idea what this is about." Birdsall replied, "Oh, I know it's about the murder." After Dickson said "Okay," Birdsall added, "'Cause my mom's like, 'Yeah, they might investigate you.' I was like, 'Oh, okay.'" Detective Mora then said that was what the officers wanted to talk to Birdsall about, but that he needed to read Birdsall his rights "before we can talk." Mora then advised Birdsall of his *Miranda* rights as outlined above.[10] The video recording of the interrogation that was played for the jury included the preliminary questioning that occurred before the *Miranda* warnings were given.

Birdsall argues the officers violated *Miranda* by conducting this questioning before giving the warnings, and he suggests it was error to admit this portion of the interrogation into evidence. In this regard, the parties dispute whether the "booking exception" to *Miranda* applies here, with the Attorney General noting some routine biographical questions are permitted, and with Birdsall arguing he was not actually being booked into jail when these questions were posed, having been taken straight to an interview room. (See *People v. Elizalde* (2015) 61 Cal.4th 523, 527, 531–532 ["[F]or a limited category of booking questions involving biographical data, no *Miranda* warnings are required and admission of the defendant's answers at trial does

_____

[10] In his appellate briefs, Birdsall incorrectly states the officers left the interview room after these initial questions and then returned before giving the *Miranda* warnings. This court has reviewed this portion of the video recording of the interrogation; the officers did not leave the room at this point.

not violate the Fifth Amendment. For questions outside this limited category, however, answers given, without an admonition, to questions an officer should know are reasonably likely to elicit an incriminating response may not be admitted in the prosecution's case-in-chief."].)

We need not determine whether the officers should have given the *Miranda* warnings earlier than they did, or whether the court should have suppressed Birdsall's prewarning statements on *Miranda* grounds. In light of the detailed confession Birdsall made after receiving *Miranda* warnings (which we conclude was properly admitted), the admission of his prewarning statements (in which he did not confess) could not have prejudiced him. Nor did the brief prewarning questioning require suppression of Birdsall's postwarning statements. (*McCurdy*, *supra*, 59 Cal.4th at p. 1088 ["[T]he officers' introductory questions were likely designed to establish a rapport with defendant, but even if they were successful, this does not establish that defendant's free will was overborne."].)

Birdsall, citing *People v. Honeycutt* (1977) 20 Cal.3d 150, argues the prewarning questioning was "a means of softening up Birdsall before *Miranda* warnings were given" and that this "tactic" supports a finding that his later implied waiver of rights and/or his postwarning statements were involuntary. We disagree. In *Honeycutt*, after the defendant was arrested for murder and brought to a police station interview room, he and a detective who had known him for several years had "a half-hour unrecorded discussion" in which they discussed "unrelated past events and former acquaintances and, finally, the victim," whom the officer disparaged. (*Id.* at p. 158.) At the end of the half hour, the defendant stated he would talk about the homicide. (*Ibid.*) The police then gave *Miranda* warnings, and the defendant confessed. (*Id.* at pp. 158–159.)

14

In these circumstances, the Supreme Court found error in admitting the confession, stating that "[w]hen the waiver results from a clever softening-up of a defendant through disparagement of the victim and ingratiating conversation, the subsequent decision to waive without a *Miranda* warning must be deemed to be involuntary . . . ." (*People v. Honeycutt*, *supra*, 20 Cal.3d at p. 160.) *Honeycutt* is inapposite. Here, the officers did not disparage the victim, engage in conversation that could fairly be characterized as "ingratiating," or fail to give Birdsall *Miranda* warnings before he confessed. (*Krebs*, *supra*, 8 Cal.5th at p. 306 [holding *Honeycutt* did not apply where these circumstances were not present; stating *Honeycutt* "has been limited to its facts"].)

b. *Adequacy of the* Miranda *Advisements*

Birdsall next contends the *Miranda* warnings given were deficient. We disagree. *Miranda* " ' "require[s] law enforcement agencies to advise a suspect, before any custodial law enforcement questioning, [1] that 'he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.' " ' " (*McCurdy*, *supra*, 59 Cal.4th at pp. 1085–1086.) This rule applies when the suspect is a juvenile. (See *Fare v. Michael C.* (1979) 442 U.S. 707, 717, 725.) Detective Mora, reading from a form, gave Birdsall the four required warnings.

Birdsall argues, however, that the officers should have given additional warnings or explanations to ensure he fully understood his rights, including telling him (1) he could decide *during* questioning to invoke his rights and cut off questioning, (2) he had "the right of counsel, either retained or appointed [citation], as opposed to appointed counsel before questioning and counsel during questioning," and (3) to invoke his rights, he had to do so clearly and

15

unequivocally. While additional advisements given by police may bolster the conclusion that the suspect understood his rights (see *Berghuis*, *supra*, 560 U.S. at pp. 375, 386), Birdsall cites no authority requiring the additional advisements he argues should have been given. We decline to hold the standard warning given here was defective under *Miranda*.

### c. *Birdsall's Waiver of Rights Was Knowing and Intelligent*

Based on the totality of the circumstances, we agree with the trial court that Birdsall understood his rights and knowingly and intelligently waived them. We note initially that, when Detective Mora read the *Miranda* warnings and asked Birdsall whether he understood his rights, Birdsall stated he did. In addition, based on our review of the video recording of the interrogation, we agree with the trial court that Birdsall "had no problem whatsoever in interacting or engaging with the police officers, that up to and through the *Miranda* admonition and beyond, when questions were asked of him, he gave appropriate answers." Birdsall corrected Mora at one point during the preliminary questioning, and disagreed with the officers at other points, showing that he was "obviously listening and thinking beyond just accepting what the person was saying." He did not appear to be "in a fog." Finally, over the course of the interrogation, Birdsall was able to explain his actions in great detail, including his state of mind at the time of the crime.

Birdsall testified at the suppression hearing that he did not understand the *Miranda* admonition that was given at his interrogation and that he did not feel he had the right to say no and stop talking. But as the trial court noted, Birdsall also testified he did not have *any* recollection of the *Miranda* admonition. The trial court questioned how Birdsall, if he could not recall the admonition, could remember that he did not understand it. The court concluded this conflict "raises a serious question about [Birdsall's] testimony to the effect that he didn't understand those rights." The court's decision to

discount Birdsall's testimony on this point is supported by the record and is entitled to deference.

Dr. Winkel testified that Birdsall's psychological disorders and disabilities compromised his ability to understand the *Miranda* admonition. The trial court concluded that, while Dr. Winkel was an impressive witness overall, he lost some credibility when he suggested Birdsall was not capable of understanding the warnings. More broadly, the trial court concluded, and we agree, that Birdsall's demeanor and conduct on the video recording of the interrogation support the conclusion that he understood the admonitions, as he told the officers he did.

For the foregoing reasons, we conclude the prosecution proved by a preponderance of the evidence that Birdsall understood his rights and the consequences of waiving them, and that his waiver thus was knowing and intelligent. (*Berghuis*, *supra*, 560 U.S. at pp. 382–383.)

d. *Birdsall's Waiver and Statement Were Voluntary*

We further conclude Birdsall's waiver and statement were voluntary. As noted, we inquire whether his waiver " 'was the product of a free and deliberate choice rather than intimidation, coercion, or deception' " (*Berghuis*, *supra*, 560 U.S. at p. 382), and, as to the statement itself, we ask whether his " ' "choice to confess was not 'essentially free' because his will was overborne" ' " (*Boyette*, *supra*, 29 Cal.4th at p. 411). "The waiver in this case is inferred from [Birdsall's] confession, and [Birdsall] maintains that both were involuntarily given because he was coerced." (*Krebs*, *supra*, 8 Cal.5th at p. 303.)

Specifically, Birdsall contends the officers used a variety of coercive "interrogation tactics" that rendered his confession and waiver involuntary. Birdsall argues the officers "display[ed] an air of confidence in [Birdsall's] guilt" (a "maximization" technique), "minimize[d] [the] moral seriousness of

17

[the] offense" (including by saying everyone makes "mistakes"), "exploited Birdsall's poor emotional and psychological state by urging him to tell them what happened to get it off his chest to ease his emotional torment," "isolated Birdsall from his mother and an attorney, thereby holding him incommunicado for a very long time," "conducted the interrogation in an isolated and windowless police interrogation room" where "[t]he seating arrangements . . . literally had Birdsall cornered," failed to allow Birdsall to make phone calls to his mother and an attorney as required for minor suspects by Welfare and Institutions Code section 627 and Alameda County Sheriff's Department policies, falsely stated his family wanted him to tell the truth, interrogated him for hours at a time and left him alone at times, "which was designed to increase Birdsall's anxiety and nervousness," and in sum " 'persuad[ed], trick[ed], or cajol[ed] him out of exercising his constitutional rights.' " Relying in part on *In re Elias V.* (2015) 237 Cal.App.4th 568, Birdsall suggests his age and psychological and learning deficits made him vulnerable to these interrogation techniques.

Based on our review of the record, we do not find that, individually or collectively, the challenged techniques served to overbear Birdsall's will or to render his confession or his waiver of rights involuntary. We note initially that Birdsall's age, while relevant, is a less weighty concern here than in *Elias V.*, where our Division Two colleagues found a 13-year-old boy's custodial statements to be involuntary, in part because of his youth, which rendered him susceptible to influence and pressure, as well as the likelihood the questioning officer's "use of deception and overbearing tactics would induce involuntary and untrustworthy incriminating admissions." (*In re Elias V.*, *supra*, 237 Cal.App.4th at pp. 586–587.) Birdsall was 16 years, 8 months old, in contrast to the 13-year-old "young adolescent" in *Elias V.*

18

(*Id.* at p. 591; see *id.* at p. 594.) And while we acknowledge the evidence of Birdsall's psychological conditions (including ADHD, a memory deficit, and an auditory processing deficit), we agree with the trial court that, on the video recording of the interrogation, Birdsall does not appear to be confused or unable to converse with the officers or answer their questions. The officers and Birdsall speak calmly. The officers make no threats or promises of leniency. In our view, the events depicted on the video recording weigh against a conclusion that Birdsall's will was overborne.

Turning to the specific interrogation techniques identified by Birdsall, we similarly do not find a basis for concluding his confession was involuntary. Birdsall correctly notes the interrogation room at the station does not appear to have windows, and he is seated in the corner. Although Birdsall had been arrested and was in custody, the nature of the room, in our view, does not add much to the stress that could accompany any custodial interrogation, and does not provide a basis for concluding Birdsall's statements were involuntary.

Birdsall criticizes the overall length of the interrogation, but this was not a situation where lengthy and dogged questioning (or prolonged isolation) wore a suspect down. Within about 10 minutes after Mora read Birdsall his rights, Birdsall began providing the officers with his account of the crimes. Shortly after that, Birdsall described in detail how he personally participated in the physical assault and strangulation of the victim.

As to some of the other interrogation techniques mentioned by Birdsall, the officers did display an air of confidence (including by stating "we got this shit figured out"), and they stated that "we all make mistakes," said that Birdsall's family wanted him to tell the truth, and told Birdsall "we know it's bothering you." The officers' statements along these lines do not persuade us

19

Birdsall's confession was involuntary.  To the extent the officers exaggerated the progress of their investigation and misled Birdsall about his family's wishes, their statements do not persuade us that there was anything in the questioning that is tantamount to coercion.  And contrary to Birdsall's view, we do not interpret the general statement that "we all make mistakes" as an improper promise of leniency if he confessed.  Similarly, the officers' statement that Latiolais's death was bothering Birdsall and their reference to the fact he had said that to one of his teachers does not rise to the level of improper or abusive emotional badgering that would render Birdsall's confession involuntary.

Finally, Birdsall notes the officers did not offer him the opportunity to call his mother or an attorney, as required for juvenile suspects by Welfare and Institutions Code section 627, subdivision (b) and a Sheriff's Department policy; they did not allow Birdsall's mother to speak with him; and they did not tell Birdsall his mother was at the station and had contacted a lawyer. Sergeant Dickson testified that the departmental policy at issue includes an exception for extenuating circumstances, which he concluded existed here because of the severity of the crime and the possibility there might be other suspects and other guns that were not yet accounted for.

These facts do not convince us Birdsall's confession was involuntary. Even were we to assume the department policy or the statute Birdsall relies upon was violated, a mere violation of departmental policy, or even of state law, does not warrant exclusion of evidence absent a breach of federal constitutional rights.  (*Lessie*, *supra*, 47 Cal.4th at p. 1161, fn. 2.)  Birdsall himself never asked to speak with an attorney, and the trial court discounted his testimony that he asked to speak with his mother (which would have triggered a different departmental policy to stop the interrogation).  The

20

efforts of Birdsall's mother to speak with him and to contact an attorney on his behalf (and Birdsall's lack of awareness of those events) do not require the suppression of his confession. (*Moran v. Burbine* (1986) 475 U.S. 412, 422–424 [police are not required to "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights"]; see *id.* at pp. 433–434.) Considering these events and the other facts described above as part of the totality of the circumstances, we do not find Birdsall's confession or waiver was involuntary.[11]

## B. *Birdsall's Sentence*

Birdsall argues his LWOP sentence should be vacated and the case remanded for resentencing because the sentence and the statute under which it was imposed run afoul of constitutional protections, and because the trial court failed to exercise informed discretion at sentencing and in certain pretrial proceedings. We reject these arguments.

### 1. Eighth Amendment Claims

The court sentenced Birdsall pursuant to section 190.5, subdivision (b), which provides that, for 16- and 17-year-old offenders convicted of special circumstance murder, the court has discretion to impose a sentence of LWOP or 25 years to life.[12] The California Supreme Court held in *People v.*

---

[11] Because we conclude the court did not err by admitting Birdsall's confession, we do not address the parties' arguments as to whether the asserted error was prejudicial.

[12] Section 190.5, subdivision (b) states: "The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances . . . has been found to be true . . . , who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."

*Gutierrez* (2014) 58 Cal.4th 1354, 1387 (*Gutierrez*) that this statute "confers discretion on the sentencing court" to choose either of these sentences, "with no presumption in favor of life without parole." *Gutierrez* further held that section 190.5, subdivision (b) requires a sentencing court considering an LWOP sentence for a juvenile offender to consider evidence relevant to the youth-related factors identified in *Miller v. Alabama* (2012) 567 U.S. 460, where the United States Supreme Court held *mandatory* LWOP sentences for juvenile offenders violate the Eighth Amendment to the United States Constitution. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1387–1390; *Miller*, *supra*, at pp. 465, 477–479.)

Specifically, under *Miller* and *Gutierrez*, the trial court "must consider evidence that may exist regarding (1) 'a juvenile offender's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences" '; (2) ' "the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional" '; (3) ' "the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him" '; (4) 'whether the offender "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys" '; and (5) ' "the possibility of rehabilitation." ' " (*In re Kirchner* (2017) 2 Cal.5th 1040, 1048.)

At Birdsall's sentencing hearing in September 2015 (i.e., after the decisions in *Miller* and *Gutierrez*), the trial court carefully explained its analysis of each of the *Miller* factors before sentencing Birdsall to LWOP.

Birdsall contends, however, that in light of legal developments subsequent to his sentencing hearing, both the governing sentencing statute—section 190.5, subdivision (b)—and his LWOP sentence imposed under that statute violate the Eighth Amendment. For reasons we shall explain, these arguments provide no basis for reversal of Birdsall's sentence.

In his opening brief, Birdsall relies principally on the United States Supreme Court's 2016 decision in *Montgomery v. Louisiana* (2016) 577 U.S. 190, where the court clarified that *Miller* announced a substantive rather than a procedural rule, and therefore operates retroactively. (*Montgomery, supra*, 577 U.S. at p. 212; see *In re Kirchner, supra*, 2 Cal.5th at p. 1048.) "*Montgomery* explained that '*Miller* . . . did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of "the distinctive attributes of youth." [Citation.] Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects " 'unfortunate yet transient immaturity.' " [Citation.] Because *Miller* determined that sentencing a child to life without parole is excessive for all but " 'the rare juvenile offender whose crime reflects irreparable corruption,' " [citation], it rendered life without parole an unconstitutional penalty for "a class of defendants because of their status"—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. [Citation.] As a result, *Miller* announced a substantive rule of constitutional law.' " (*In re Kirchner, supra*, 2 Cal.5th at p. 1048, quoting *Montgomery, supra*, at p. 208.)

Birdsall argues section 190.5, subdivision (b) facially violates the Eighth Amendment because, as construed in *Gutierrez*, it allows imposition of an LWOP sentence on a juvenile defendant based on an exercise of discretion

after consideration of only the " 'procedural factors' " identified in *Miller*, and without a decision or finding as to whether *Montgomery*'s substantive requirement has been met, i.e., that the juvenile's crime reflects irreparable corruption rather than the transient immaturity of youth. Birdsall also contends his LWOP sentence, imposed under section 190.5, subdivision (b), violates the Eighth Amendment as construed in *Montgomery* because the trial court, although it applied the *Miller* factors in exercising its discretion under the statute, did not expressly or impliedly find that Birdsall's crime reflected irreparable corruption, and because the record of the 2015 sentencing hearing shows Birdsall is not irreparably corrupt.

In his reply brief, Birdsall acknowledges that the recent United States Supreme Court decision in *Jones v. Mississippi* (2021) ___ U.S. ___ [141 S.Ct. 1307], which was decided after the filing of Birdsall's opening brief and the Attorney General's brief, "impacts" his Eighth Amendment arguments. In *Jones*, the high court held that, under *Miller* and *Montgomery*, the Eighth Amendment, although it prohibits mandatory LWOP sentences for juveniles, does not require a sentencer imposing an LWOP sentence on a juvenile offender to make a separate factual finding that the defendant is permanently incorrigible, or to provide an on-the-record sentencing explanation with an implicit finding that the defendant is permanently incorrigible. (*Jones*, *supra*, 141 S.Ct. at pp. 1311, 1313, 1318–1319, 1321.) Instead, "[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient." (*Id.* at p. 1313.)

*Jones* resolves Birdsall's Eighth Amendment challenges to section 190.5, subdivision (b) (which makes LWOP sentences discretionary for juveniles) and to his sentence (which was imposed after an exercise of

24

discretion under the statute). Birdsall, however, argues in his reply brief that this court should hold the discretion found sufficient for Eighth Amendment purposes in *Jones* is not sufficient under the cruel or unusual punishment clause of the California Constitution (Cal. Const., art. I, § 17) (a provision he did not rely on in his opening brief), and that a finding or showing of " 'irreparable corruption' " is required under that provision.

We need not address this argument, because, as the Attorney General points out, any claim based on the *Miller-Montgomery* limitation on LWOP sentences (whether as construed in *Jones* or under the broader formulation urged by Birdsall) is moot. Under California statutory law, Birdsall, despite his LWOP sentence, will have an opportunity to be considered for parole. Section 3051, subdivision (b)(4) (a provision that took effect January 1, 2018) currently provides: "A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is life without the possibility of parole *shall be eligible for release on parole at a youth offender parole hearing during the person's 25th year of incarceration.*" (Italics added.) At the youth offender parole hearing, the Board of Parole Hearings must "give great weight to the diminished culpability of youth as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c); see § 3046, subd. (c).)

In *People v. Franklin* (2016) 63 Cal.4th 261, 268, 278–280 (*Franklin*), the California Supreme Court held the availability of a youth offender parole hearing under section 3051 mooted the defendant's claim that his mandatory prison sentence of 50 years to life for a murder he committed at age 16 was unconstitutional under *Miller*. The *Franklin* court explained: "Sections 3051 and 3046 have thus superseded the statutorily mandated sentences of

25

inmates who, like Franklin, committed their controlling offense before the age of 18. The statutory text makes clear that the Legislature intended youth offender parole hearings to apply retrospectively, that is, to all eligible youth offenders regardless of the date of conviction." (*Franklin*, *supra*, at p. 278.) The court continued: "In sum, the combined operation of section 3051, section 3046, subdivision (c), and section 4801 means that Franklin is now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration. Such a sentence is neither LWOP nor its functional equivalent. Because Franklin is not serving an LWOP sentence or its functional equivalent, no *Miller* claim arises here. The Legislature's enactment of Senate Bill No. 260 [which took effect January 1, 2014, and added §§ 3051, 3046, subd. (c), and 4801, subd. (c) to the Penal Code] has rendered moot Franklin's challenge to his original sentence under *Miller*." (*Id.* at pp. 279–280, 276.)

When *Franklin* was decided in 2016, section 3051 excluded persons sentenced to LWOP from eligibility for a youth offender parole hearing, and as noted, the defendant there was challenging a mandatory prison sentence of 50 years to life. (*Franklin*, *supra*, 63 Cal.4th at pp. 277–278, citing § 3051, former subd. (h); *id.* at p. 268.) The *Franklin* court noted the context in which it was ruling, stating: "Our mootness holding is limited to circumstances where, as here, section 3051 entitles an inmate to a youth offender parole hearing against the backdrop of an otherwise lengthy mandatory sentence. We express no view on *Miller* claims by juvenile offenders who are ineligible for such a hearing under section 3051, subdivision (h), or who are serving lengthy sentences imposed under discretionary rather than mandatory sentencing statutes." (*Franklin*, at p. 280.)

The Legislature subsequently (in Senate Bill No. 394 (2017–2018 Reg. Sess.), which took effect January 1, 2018) "extend[ed] the availability of a mandatory parole hearing to juveniles sentenced to life without parole." (*People v. Ochoa* (2020) 53 Cal.App.5th 841, 850.)  In light of this amendment, which added subdivision (b)(4) to section 3051, the Court of Appeal held in *Ochoa* that the mootness principle announced in *Franklin* applies to juveniles sentenced to LWOP under section 190.5, subdivision (b). The *Ochoa* court explained:  "By affording those individuals a meaningful opportunity for release, the Legislature has effectively mooted any claim that imposition of life without parole on a juvenile offender violates the Eighth Amendment.  (See *Franklin, supra*, 63 Cal.4th at pp. 279–280 [finding *Miller* issues moot with regard to defendants subject to § 3051, subd. (b)]; *In re Kirchner* (2017) 2 Cal.5th 1040, 1054 [statute that provides juvenile offenders sentenced to life terms with parole hearings no later than their 25th year of incarceration is an example of adequate response to *Miller*]; [citation].)" (*Ochoa, supra*, at p. 850.)

We agree with *Ochoa* that the *Franklin* mootness principle applies here, and we hold that Birdsall's challenges on Eighth Amendment grounds to section 190.5, subdivision (b) and to the LWOP sentence imposed on him under that statute (and the analogous challenges he seeks to assert on reply under the California Constitution) are moot.  By enacting section 3051, subdivision (b)(4), the Legislature has afforded to Birdsall and other juveniles sentenced to LWOP a meaningful opportunity for release.  (*People v. Ochoa, supra*, 53 Cal.App.5th at p. 850; see *Montgomery v. Louisiana, supra*, 577 U.S. at p. 212 ["A State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them."].)

27

Birdsall resists this conclusion, suggesting that the Attorney General, by invoking the *Franklin* mootness rule, is arguing for a result not intended by the Legislature, such as (1) that there now exists "an oxymoronic fictional sentence of LWOP with parole," (2) that Birdsall's sentence "must be modified to 'life with the possibility of parole,' " or (3) that there has been a "statutory repeal," i.e., section 3051, subdivision (b)(4) has repealed the LWOP punishment authorized by section 190.5, subdivision (b). We need not delve into these points—we do not undertake to relabel Birdsall's sentence, and we do not hold there has been a statutory repeal or similar action by the Legislature. We hold only that, because a youth offender parole hearing will be available to Birdsall during his 25th year of incarceration (when he will be 41 years old), the sentence imposed on him, although denominated LWOP, does not give rise to any viable appellate challenge under the Eighth Amendment (or its California analogue).[13]

## 2. The Alleged Need for a New Exercise of Discretion Under Section 190.5

Birdsall argues that, even if section 190.5, subdivision (b) does not violate the Eighth Amendment, this court should remand for resentencing under that statute, i.e., for the trial court to again exercise discretion whether

---

[13] Birdsall also contends "[t]he *Franklin* moot doctrine is inapplicable" because he has presented other grounds for vacating his sentence that are independent of the *Miller*/Eighth Amendment issue. We address those other arguments in parts II.B.2.–6., *post*, but they do not alter our conclusion that the Eighth Amendment claims are moot.

Finally, Birdsall argues that, if this court finds his Eighth Amendment claims are moot, we should remand for "a *Franklin* proceeding" to preserve evidence that will be relevant at a future youth offender parole hearing under section 3051 or other possible future statutory resentencing proceedings. (See *Franklin*, *supra*, 63 Cal.4th at p. 284.) We address that argument in part II.B.7., *post*.

to sentence Birdsall to LWOP or to a term of 25 years to life.  Birdsall contends resentencing is necessary so the trial court can consider legal and factual developments that have occurred since his 2015 sentencing, including (1) the United States Supreme Court's 2016 decision in *Montgomery* clarifying the scope of *Miller*, (2) the California Legislature's October 2017 enactment of Senate Bill No. 394 (2017–2018 Reg. Sess.), amending section 3051 to extend the availability of youth offender parole hearings to juveniles convicted of murder and sentenced to LWOP, and (3) the evidentiary record developed at Birdsall's juvenile court transfer hearing in December 2019.

As the Attorney General notes, none of these arguments establishes the trial court committed error at the original sentencing hearing.  We therefore find no basis to vacate the sentence or to order resentencing.  As for the *Miller-Montgomery* issue, it is undisputed the trial court considered the *Miller* factors in exercising its discretion under section 190.5, subdivision (b) as required by the California Supreme Court's decision in *Gutierrez*. (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1387–1390.)  This also satisfied federal law.  (*Jones v. Mississippi*, *supra*, 141 S.Ct. at p. 1313.)  We decline to hold that more was required.

The amendment of section 3051 to make youth offender parole hearings available to juveniles sentenced to LWOP also does not support Birdsall's claim that resentencing should be ordered.  To the contrary, as discussed, the Legislature in section 3051 has selected the youth offender parole hearing (rather than a resentencing in each case) as the remedy where a sentence might otherwise be vulnerable to attack as constitutionally disproportionate. (See *Franklin*, *supra*, 63 Cal.4th at pp. 279–280, 286–287.)

Finally, while it is possible that additional evidence developed at Birdsall's transfer hearing might be relevant to a new sentencing decision, that does not show the trial court erred in exercising its discretion based on the evidence that was before it when it ruled.

### 3. The Trial Court's Alleged Failure To Exercise Discretion Under Section 1385 To Strike the Special Circumstance Allegations

Birdsall contends the trial court had discretion under section 1385 to strike the special circumstance allegations before trial but did not realize it had discretion to do so. Birdsall argues that therefore this court should reverse the special circumstance findings made by the jury and remand for the trial court to exercise discretion as to whether to strike the special circumstance allegations.

Section 1385 generally authorizes a judge to order an action dismissed in furtherance of justice.[14] (§ 1385, subd. (a).) But section 1385.1 provides: "Notwithstanding Section 1385 or any other provision of law, a judge shall not strike or dismiss any special circumstance which is admitted by a plea of guilty or nolo contendere or is found by a jury or court as provided in Sections 190.1 to 190.5, inclusive." In light of section 1385.1, the court had no authority to strike the special circumstances found by the jury. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1075.)

---

[14] Section 1385, subdivision (a) provides: "The judge or magistrate may, either on motion of the court or upon the application of the prosecuting attorney, and in furtherance of justice, order an action to be dismissed. The reasons for the dismissal shall be stated orally on the record. The court shall also set forth the reasons in an order entered upon the minutes if requested by either party or in any case in which the proceedings are not being recorded electronically or reported by a court reporter. A dismissal shall not be made for any cause that would be ground of demurrer to the accusatory pleading."

Birdsall argues, however, that section 1385 would have permitted, and section 1385.1 would not have precluded, the striking of the special circumstance allegations *before trial*, i.e., before the jury found them to be true. The Attorney General does not respond to this point, and neither party has cited a case addressing it, but we need not resolve the issue. Even assuming Birdsall is correct that a trial court has authority to strike a special circumstance allegation before trial, there is no basis for reversal here.

First, as the Attorney General notes, Birdsall never asked the court to strike the special circumstance allegations under section 1385. Prior to trial, Birdsall moved to strike the felony-murder special circumstances (i.e., two of the three alleged special circumstances) based on a constitutional argument derived in part from *Miller*. The court denied the motion, noting that California's discretionary sentencing scheme for juveniles convicted of special circumstance murder (§ 190.5, subd. (b)) complies with *Miller* and allows the trial court, *after trial*, to impose a sentence other than LWOP even if special circumstance allegations are found true. During this colloquy (which is the only part of the record cited by Birdsall in support of his assertion that the court did not understand the scope of its discretion under section 1385), neither the court nor counsel mentioned section 1385 as a possible basis for striking the special circumstance allegations.

Because Birdsall did not ask the court to strike the special circumstance allegations under section 1385, he has forfeited any appellate claim that the court erred by failing to do so. (*People v. Carmony* (2004) 33 Cal.4th 367, 375–376.) In his reply brief, Birdsall suggests he did not need to raise the issue in the trial court because no appellate court had held that section 1385 discretion exists in this circumstance. We reject this argument. The principal authorities on which Birdsall bases his current

31

appellate contention (sections 1385 and 1385.1, *Mendoza*, and earlier cases addressing the scope of section 1385 discretion, such as *People v. Williams* (1981) 30 Cal.3d 470) existed at the time of Birdsall's trial. Moreover, adoption of Birdsall's view would nullify section 1385.1—under his approach, although a trial court may not strike a jury's special circumstance finding, an appellate court may reverse that finding because the trial court did not consider striking the special circumstance allegations prior to trial, even though it was never asked to do so.

Birdsall also suggests in his reply brief that, if there was a forfeiture, his trial counsel provided ineffective assistance. We are not persuaded by this undeveloped argument. As to the first requirement for establishing an ineffective assistance claim—the deficient performance of counsel—we do not believe trial counsel's failure to develop the argument about the scope of pretrial section 1385 discretion that Birdsall has crafted on appeal (an issue on which he states the law was "unclear or uncertain") constitutes deficient performance. (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 [to establish ineffective assistance, defendant must show "counsel's representation fell below an objective standard of reasonableness under prevailing professional norms"].)

Birdsall also has not shown prejudice, i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.) As noted above, and as the Attorney General points out, when the trial court was presented with a pretrial request to strike some of the special circumstance allegations on constitutional grounds, the court declined to do so, emphasizing it would have discretion after trial to decide on an appropriate sentence for Birdsall and would not be bound to impose an

LWOP sentence. We do not think it reasonably probable that the court would have ruled differently if Birdsall's counsel had instead asked the court to strike the special circumstance allegations on statutory grounds under section 1385.

### 4. The Trial Court's Alleged Failure To Exercise Discretion Under Section 1385 To Strike the "First Degree Murder Allegations"

Birdsall contends the trial court had authority under section 1385 to strike the "first degree murder allegations," but did not realize it had that authority. He states that, if the court had exercised this power, he would have faced only the punishment applicable to second degree murder, i.e., a sentence of 15 years to life. (§ 190, subd. (a).) Birdsall argues this court should reverse his first degree murder conviction and remand the case to give the trial court an opportunity to strike the first degree murder allegations.

Again, as the Attorney General points out, Birdsall did not ask the trial court to employ section 1385 in this manner, and he does not point to any statement by the trial court showing it misunderstood the scope of its discretion under that statute. He has forfeited his appellate claim. (*People v. Carmony*, *supra*, 33 Cal.4th at pp. 375–376.)

In any event, California Supreme Court authority forecloses this claim. In *In re Varnell* (2003) 30 Cal.4th 1132, 1134–1135 & fn. 3 (*Varnell*), the court held that, while section 1385 authorizes trial courts to dismiss " 'charges or allegations in an indictment or information,' " it does not confer discretion to "disregard 'sentencing factors' " (i.e., aggravating or mitigating circumstances supporting a specific sentence within a range) "that are not themselves required to be a charge or allegation in an indictment or information." In reaching this conclusion, the court summarized prior case law establishing section 1385 cannot be used for purposes other than to

33

dismiss offenses or allegations in an accusatory pleading, and specifically cannot be used to reduce a verdict of first degree murder to second degree murder. (*Varnell*, *supra*, at p. 1137.)

The *Varnell* court stated: " 'The *only* action that may be dismissed under Penal Code section 1385, subdivision (a), is a criminal action or a part thereof.' [Citation.] We have consistently interpreted 'action' to mean the 'individual charges and allegations in a criminal action' [citations] and have never extended it to include mere sentencing factors. Thus, our courts have refused to permit trial courts to invoke section 1385 to dismiss sanity proceedings or a plea of insanity [citation]; *to reduce a verdict of first degree murder to second degree murder* (*People v. Superior Court* (*Prudencio*) (1927) 202 Cal. 165, 173–174 [(*Prudencio*)], disapproved on other grounds in *People v. Superior Court* (*Howard*) (1968) 69 Cal.2d 491, 501; cf. § 1181, pars. 6, 7); to reduce the offense of conviction to an uncharged lesser related offense [citation]; or to enter a judgment of acquittal [citation]. A ruling that section 1385 could be used to disregard sentencing factors, which similarly are not included as offenses or allegations in an accusatory pleading, would be unprecedented." (*Varnell*, *supra*, 30 Cal.4th at p. 1137, second italics added.)

In *Prudencio*, cited in *Varnell*, the defendant was charged with murder, a charge that encompassed "murder of the first degree and . . . all the subdivisions and lesser degrees of murder and also manslaughter." (*Prudencio*, *supra*, 202 Cal. at p. 167.) Although the jury returned a verdict of first degree murder, the court "assumed" the verdict was for second degree murder and entered judgment for the lesser crime. (*Id.* at p. 168.) The Supreme Court rejected a belated contention that the reduction from first

34

degree to second degree murder was justified under section 1385. (*Prudencio,*
*supra,* at pp. 173–174.)

The information here charged Birdsall and Nicosia in count one with "a
Felony, to wit:  MURDER, a violation of section 187(a) of the PENAL CODE
of California, in that . . . said defendants did unlawfully, and with malice
aforethought, murder [Latiolais], a human being."  No allegation as to the
degree of the crime was included or could be stricken under section 1385.
(*Varnell, supra,* 30 Cal.4th at pp. 1134–1135, 1137; *Prudencio, supra,*
202 Cal. at pp. 167, 173–174.)

Birdsall did not cite *Varnell* or *Prudencio* in his opening brief.  In
response to the Attorney General's citation of those cases, Birdsall argues in
reply that *Prudencio*'s discussion of section 1385 is dicta, and that *Varnell* did
not acknowledge an intervening decision—*People v. Marsh* (1984) 36 Cal.3d
134—that he contends is inconsistent with *Prudencio.*  We do not agree that
*Prudencio*'s discussion of section 1385 (in response to an argument that the
trial court's action there was justified under the statute) was dicta.
(*Prudencio, supra,* 202 Cal. at pp. 173–174.)  But in any event the Supreme
Court in *Varnell* approved and reaffirmed the principle established in
*Prudencio*, and we will follow it.  (*Varnell, supra,* 30 Cal.4th at p. 1137.)[15]

---

[15] In *People v. Tirado* (2022) 12 Cal.5th 688, 700, footnote 13, the
Supreme Court concluded *Prudencio* was not instructive on the question
whether a trial court has authority under section 12022.53 to impose a lesser
firearm enhancement after striking a greater one.  Among the distinctions it
noted between *Prudencio* and the case before it, the *Tirado* court stated:
"Unlike *Prudencio*, this is not a murder case, and section 12022.53 does not
limit a trial court to imposing the enhancement found true by the jury."
(*Tirado*, at p. 700, fn. 13.)  *Tirado* did not hold or state that the portion of
*Prudencio* relied on by *Varnell*—the principle that section 1385 does not
authorize a trial court to reduce a conviction of first degree murder to second
degree murder—is invalid.  (*Varnell, supra,* 30 Cal.4th at p. 1137.)

35

*Marsh* and the other authorities on which Birdsall relies—
section 190.03 and *People v. Hatch* (2000) 22 Cal.4th 260—address different
situations and do not persuade us to depart from *Varnell* and *Prudencio*.
(See § 190.03, subds. (a)–(b) [trial court may strike, "in the interest of
justice," an allegation in the accusatory pleading that a first degree murder is
a hate crime]; *Hatch*, *supra*, at pp. 268–269, 273, 276 [discussing scope of
section 1385 generally; referring to prior case where trial court dismissed
murder charges under section 1385 after a mistrial]; *People v. Marsh*, *supra*,
36 Cal.3d at pp. 143–144 & fn. 7 [section 1385 may be used to strike ransom
and bodily harm allegations associated with kidnaping charge under
section 209].)

## 5. Equal Protection

Birdsall contends his LWOP sentence should be reversed because the
statute under which it was imposed—section 190.5, subdivision (b)—violates
the equal protection provisions of the federal and state constitutions (U.S.
Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a)). He argues the statute
is unconstitutional because it authorizes imposition of an LWOP sentence (or
a sentence of 25 years to life) for 16 and 17 year olds but not 14 and 15 year
olds.[16] We disagree.

---

[16] As discussed, section 190.5, subdivision (b) authorizes LWOP or a
term of 25 years to life for 16- and 17-year-old offenders convicted of first
degree murder with special circumstances. Prior to 2019, a 14- or 15-year-old
offender convicted of first degree murder in adult criminal court would be
sentenced to a term of 25 years to life; LWOP was not an available sentence.
(§§ 190, subd. (a), 190.5, subd. (b); see *Gutierrez*, *supra*, 58 Cal.4th at p. 1393
(conc. opn. of Corrigan, J.).)

Following the Legislature's 2018 enactment of Senate Bill No. 1391
(2017–2018 Reg. Sess.), juveniles accused of committing crimes when they
are 14 or 15 years old cannot be transferred from juvenile court to adult

The right to equal protection is violated when "the government . . . treat[s] a [similarly situated] group of people unequally without some justification." (*People v. Chatman* (2018) 4 Cal.5th 277, 288.) The degree of required justification depends on the classification at issue. Distinctions that involve suspect classifications (such as race) or affect fundamental rights are subject to strict scrutiny, and will be upheld only if they are necessary to achieve a compelling state interest. (*Ibid.*) But when "a statute involves neither a suspect class nor a fundamental right, it need only meet minimum equal protection standards, and survive 'rational basis review.' " (*People v. Turnage* (2012) 55 Cal.4th 62, 74.) Under that standard, "equal protection of the law is denied only where there is no 'rational relationship between the disparity of treatment and some legitimate governmental purpose.' " (*Ibid.*)

Even if we assume older and younger juveniles are similarly situated so as to trigger some level of equal protection scrutiny, section 190.5, subdivision (b)'s authorization of LWOP sentences for 16 and 17 year olds but not for younger teens does not violate equal protection.

First, the statute need only pass the rational basis test. Birdsall concedes age is not a suspect classification. (E.g., *Hicks v. Superior Court* (1995) 36 Cal.App.4th 1649, 1657.) He contends, however, that strict scrutiny is appropriate here because section 190.5, subdivision (b) affects a fundamental interest, his personal liberty. We disagree. A defendant has no fundamental right or liberty interest " 'in a specific term of imprisonment or

---

criminal court, unless they are first apprehended after the end of juvenile court jurisdiction. (Welf. & Inst. Code, § 707, subd. (a)(1)–(2); *O.G. v. Superior Court* (2021) 11 Cal.5th 82, 87, 89 (*O.G.*).) Accordingly, in most cases, a juvenile in this age group who is accused of murder no longer faces the potential adult-court punishment of 25 years to life that was previously available.

in the designation a particular crime receives.' " (*People v. Wilkinson* (2004) 33 Cal.4th 821, 838.)  We acknowledge that our Supreme Court's decision in *People v. Olivas* (1976) 17 Cal.3d 236, 239, 251 (cited by Birdsall) suggested that strict scrutiny may apply to differential treatment arising out of the classification of crimes, but the court's subsequent decision in *Wilkinson* limited *Olivas* and rejected the proposition that " '*Olivas* . . . require[s] the courts to subject all criminal classifications to strict scrutiny . . . .' " (*Wilkinson, supra*, at p. 838.)

As to the difference between juvenile and adult court treatment for youthful offenders, our Supreme Court has noted that a defendant has "no right to be subject to the juvenile court law." (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 570.)  To the extent the exercise of prosecutorial discretion leads to different treatment for individual juveniles who are within the age group that is eligible for transfer to adult court (with some cases moving to adult court and others remaining in juvenile court), this difference in treatment does not violate equal protection.  (*Id.* at pp. 567–568, 570; see Welf. & Inst. Code, § 707, subd. (a) [for an alleged offender who is 16 or older, the prosecutor "may" move to transfer the matter to adult court].)  Birdsall concedes that he and other 16- and 17-year-old offenders who are tried in adult court (and thus become subject to the LWOP and 25 years to life sentences authorized by § 190.5, subd. (b) if they are found guilty of special circumstance murder) are not denied equal protection because other 16- and 17-year-old offenders remain in juvenile court.

Birdsall contends, however, that 16- and 17-year-old offenders who are tried in adult court *are* denied equal protection by the legislative decision to "exempt" 14- and 15-year-old offenders from being tried in adult court.  He suggests that because 14 and 15 year olds are capable of committing crimes

(see § 26), equal protection principles require that they (along with 16 and 17 year olds) be eligible for adult court treatment, including the life sentences authorized by section 190.5, subdivision (b).

We reject the notion that age 14 is the only constitutionally permissible cutoff for adult court treatment. As our Supreme Court explained recently in *O.G.*, *supra*, 11 Cal.5th at p. 88, for decades beginning in 1961, the minimum age for adult court treatment in California was age 16. In 1995, California began to allow prosecution of some 14 and 15 year olds in adult court (*ibid.*), but Senate Bill No. 1391, which took effect January 1, 2019, "marked a return" to "the historical rule," i.e., "the rule in place beginning in 1961 and for close to 34 years thereafter—16 again became the minimum age for transferring a minor to criminal court."[17] (*O.G.*, *supra*, at p. 89.) We decline to hold the age 14 cutoff that applied in the interim became set in stone for equal protection purposes. And in light of the " 'sea change in penology regarding the relative culpability and rehabilitation possibilities for juvenile offenders' " that has occurred in recent decades in response to scientific research about adolescent brain development (*id.* at p. 88), we conclude the goal of treating younger and less mature juveniles more leniently than older ones is, at the very least, a legitimate governmental purpose within the meaning of the rational basis test. California's current approach—allowing adult court prosecution of some 16 and 17 year olds but no younger

---

[17] While the age cutoff for adult court treatment has changed, the limitation of LWOP eligibility to those 16 and older has not. Section 190.5, subdivision (b), which has remained unchanged since 1990, has never authorized an LWOP sentence for an offender younger than 16 (a feature of California law that was praised in 2014 in a concurring opinion signed by four members of our Supreme Court). (See *Gutierrez*, *supra*, 58 Cal.4th at p. 1393 (conc. opn. of Corrigan, J.).)

juveniles—bears a rational relationship to that purpose. We reject Birdsall's equal protection claim.

### 6. Due Process

Relying on the same themes he pressed in his equal protection claim, Birdsall argues section 190.5, subdivision (b) violates the due process clauses of the federal and state constitutions (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a)) because it subjects 16 and 17 year olds, but not 14 and 15 year olds, to LWOP sentences. We disagree. For the reasons we discussed above in connection with the equal protection argument, the current legislative scheme does not violate due process. A defendant in Birdsall's position has no right to have his case adjudicated in juvenile court (*Manduley v. Superior Court, supra*, 27 Cal.4th at pp. 562, 567, 570, 573 [rejecting procedural due process and equal protection challenges to then-existing legislative scheme allowing adult court prosecution of juveniles]), and California's practice of treating younger juveniles more leniently than older ones is far from arbitrary or irrational. (See *People v. Grant* (2011) 195 Cal.App.4th 107, 113–114 [in absence of fundamental liberty interest, substantive due process requires only that legislation have a rational relationship to a valid state interest]; see also *O.G., supra*, 11 Cal.5th at pp. 88–89, 92; *Gutierrez, supra*, 58 Cal.4th at p. 1393 (conc. opn. of Corrigan, J.).)

### 7. *Franklin* Hearing

Birdsall argues briefly that, if this court finds his Eighth Amendment claims are moot (as we have done in part II.B.1., *ante*), we should remand for "a *Franklin* proceeding" to preserve evidence that will be relevant at a future youth offender parole hearing under section 3051 or other future proceedings. (See *Franklin, supra*, 63 Cal.4th at p. 284.) In *Franklin*, the Supreme Court held that, in some circumstances, it may be necessary to create a record so

that "information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate" the decision by the Board of Parole Hearings as to whether to grant parole. (*Id.* at p. 283.) The *Franklin* court remanded to the trial court to determine whether the defendant had been afforded a sufficient opportunity to put such information on the record, and if not, to hold a hearing where he could do so. (*Id.* at p. 284.)

Here, as the Attorney General notes, and as Birdsall acknowledges, the juvenile court transfer hearing that was held in December 2019 on remand after Birdsall's first appeal included the taking of evidence about Birdsall's background. Birdsall does not contend the record created at the transfer hearing will be an inadequate basis for the Board of Parole Hearings to understand his "characteristics and circumstances at the time of the offense." (*Franklin*, *supra*, 63 Cal.4th at p. 283.) He argues, however, that a remand is necessary so he can create a record of his prison conduct and rehabilitation during the time that has elapsed *since* the December 2019 transfer hearing.

We are not persuaded a second remand is warranted here. Because Birdsall has submitted evidence about his background, the Board of Parole Hearings will be able to assess, at a future youth offender parole hearing, his " 'subsequent growth and increased maturity' " as measured from that baseline. (*Franklin*, *supra*, 63 Cal.4th at p. 283, citing § 4801, subd. (c); see § 3051, subd. (f)(1).) As the *Franklin* court noted, "[c]onsideration of 'subsequent growth and increased maturity' implies the availability of information about the offender *when he was a juvenile*," which is the reason it is necessary to gather evidence on that subject. (*Franklin*, *supra*, at p. 284, italics added.) That has been done here. We do not read *Franklin* as requiring further periodic update hearings to preserve snapshots of an

41

offender's rehabilitative progress, evidence of which he will be able to present at his eventual youth offender parole hearing. (See §§ 3051, subd. (f), 4801, subd. (c).)

### C. *The Jury Instruction on Felony Murder*

Birdsall contends that, in light of recent legislative enactments, the jury instruction given at his trial on "the felony-murder theory of first degree murder" was prejudicially erroneous, requiring reversal of his first degree murder conviction and the accompanying special circumstance findings. He relies on Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which took effect on January 1, 2019, and Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775), effective January 1, 2022. We conclude that, while Birdsall may seek relief under these enactments in this appeal, he is not entitled to relief on this record and there is no basis for reversal.

### 1. Senate Bill 1437

Senate Bill 1437 " 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § l, subd. (f).)" (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).)

As outlined by our Supreme Court in *Gentile*, Senate Bill 1437 furthered that purpose by adding three provisions to the Penal Code:

"First, to amend the felony-murder rule, Senate Bill 1437 added section 189, subdivision (e): 'A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent

42

to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' . . . .

"Second, to amend the natural and probable consequences doctrine, Senate Bill 1437 added section 188, subdivision (a)(3) . . . : 'Except [for felony-murder liability] as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime.'

"Third, Senate Bill 1437 added section 1170.95 to provide a procedure for those convicted of felony murder or murder under the natural and probable consequences doctrine to seek relief under the two ameliorative provisions above."  (*Gentile*, *supra*, 10 Cal.5th at pp. 842–843.)

Specifically, as to the third change noted by the *Gentile* court, under section 1170.95, the convicted person "may file a petition with the court that sentenced the petitioner to have the petitioner's . . . conviction vacated and to be resentenced on any remaining counts" when certain conditions apply. (§ 1170.95, subd. (a).)

**2.  Senate Bill 775**

Senate Bill 775 amended section 1170.95 in several respects, including (1) clarifying that, in some circumstances, the same relief available to persons convicted of murder is also available to persons convicted of attempted murder or manslaughter (§ 1170.95, subd. (a); Stats. 2021, ch. 551,

§§ 1, subd. (a), 2)[18]; and (2) addressing various aspects of the petition procedure, including the petitioner's right to counsel, the standard for determining the existence of a prima facie case, the burden of proof at the hearing to determine whether a petitioner is entitled to relief, and the evidence a court may consider at that hearing (§ 1170.95, subds. (b)–(d); Stats. 2021, ch. 551, §§ 1, subds. (b)–(d), 2).

Significantly for the present case, Senate Bill 775 amended section 1170.95 to provide that a person with a qualifying conviction that is *not final* may challenge the validity of that conviction *on direct appeal* based on Senate Bill 1437's changes to the murder statutes. (§ 1170.95, subd. (g); Stats. 2021, ch. 551, § 2.) Section 1170.95, subdivision (g) states: "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437 . . . ." A defendant whose conviction is not final is not required to use the petition procedure set forth in section 1170.95 to seek Senate Bill 1437 relief, but may instead raise the Senate Bill 1437 claim on direct appeal.[19] (Assem. Com. on

---

[18] In an uncodified statement of purpose, Senate Bill 775 states that it "[c]larifies that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural and probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories." (Stats. 2021, ch. 551, § 1, subd. (a).)

[19] Our Supreme Court held in *Gentile* that "[t]he ameliorative provisions of Senate Bill 1437 do not apply on direct appeal to nonfinal convictions obtained before the law became effective. Such convictions may be challenged on Senate Bill 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*Gentile, supra*, 10 Cal.5th at pp. 851–852.) By expressly authorizing defendants whose convictions are not final to seek relief under Senate Bill 1437 on direct appeal (§ 1170.95,

Public Safety, Rep. on Sen. Bill No. 775 (2021–2022 Reg. Sess.) as amended July 6, 2021, pp. 1–2 ["[T]his bill: [¶] . . . [¶] [(1)] (j) [s]tates that a person convicted of murder, attempted murder, or manslaughter, whose conviction is not final, may challenge the validity of that conviction on direct appeal *rather than via the petition*." (Italics added.)]; *id.* at p. 11; accord, *People v. Hola* (Apr. 11, 2022, C087459) ___ Cal.App.5th ___ [2022 Cal.App.LEXIS 303, *11 & fn. 7] [under Senate Bill 775, defendants whose convictions are not final may raise Senate Bill 1437 claims on direct appeal as an "alternative" to the petition procedure; further stating, "Nothing in the legislation precludes defendants who do not seek relief on appeal from seeking relief via the section 1170.95 petition procedure after the appeal is completed."].)

Because Birdsall's murder conviction is not yet final, he may raise his Senate Bill 1437 claim in this appeal. (See *People v. Vieira* (2005) 35 Cal.4th 264, 305–306 [conviction is not final while appeal is pending].)

### 3. Background to Birdsall's Senate Bill 1437 Claim: The Trial Court's Instructions on Murder

The trial court instructed the jury on two theories that could have led to a first degree murder conviction: (1) premeditated murder, i.e., a killing with malice aforethought (CALCRIM Nos. 548, 520), elevated to first degree murder by proof that Birdsall "acted willfully, deliberately, and with premeditation" (CALCRIM No. 521), and (2) first degree felony murder, i.e., a killing during a burglary or robbery (CALCRIM Nos. 548, 540A). As to the felony-murder theory, the court gave an instruction (CALCRIM No. 540A) permitting conviction if *Birdsall*, while committing or attempting to commit a

---

subd. (g), enacted by Stats. 2021, ch. 551, § 2), Senate Bill 775 has abrogated *Gentile*.

burglary or robbery, "caused the death of another person."[20]  The court did not give the related pattern instruction permitting conviction if *a coparticipant* in the underlying felony "caused the death of another person" (CALCRIM No. 540B).[21]

Birdsall argues his conviction of first degree murder was based on the felony-murder theory, which he contends is defective in light of Senate Bills 1437 and 775.

### 4.  Birdsall Is Not Entitled to Relief

As noted, Birdsall contends the instruction given at his trial on "the felony-murder theory of first degree murder" (based on CALCRIM No. 540A) was prejudicially erroneous.  Specifically, he argues the instruction was defective because it "omi[tted]" "essential elements" that now (under Senate Bill 1437) must be proven to establish felony murder liability, i.e., that he was the actual killer; or, with the intent to kill, he aided in the commission of

---

[20] The court's instruction stated:  "The defendant is guilty of murder under the theory of felony murder if the People have proved that:  [¶] 1. The defendant committed or attempted to commit burglary or robbery; [¶] 2. The defendant intended to commit burglary or robbery; [¶] AND [¶] 3. While committing or attempting to commit burglary or robbery, *the defendant caused the death of another person*.  [¶] A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.  [¶] The defendant must have intended to commit the felony of burglary or robbery before or at the time that he caused the death.  [¶] If you find that the defendant is guilty of murder under a theory of felony murder, it is murder in the first degree."  (Italics added.)

[21] In addition to instructing on felony murder as a basis for a first degree murder conviction (CALCRIM No. 540A), the court instructed on the felony-murder special circumstance (CALCRIM No. 730).  That instruction, too, required the jury to find "*[t]he defendant* did an act that caused the death of another person."  (Italics added.)  Birdsall does not challenge the correctness of the court's instruction on the felony-murder special circumstance.

first degree murder; or, as a major participant in the underlying burglary and/or robbery, he acted with reckless indifference to human life. (§§ 188, subd. (a)(3), 189, subd. (e)(1)–(3); see *People v. Merritt* (2017) 2 Cal.5th 819, 824 (*Merritt*) [failure to instruct on some of the elements of a charged crime is constitutional error].) The Attorney General partially accepts this premise, stating, "[w]e agree with [Birdsall] that under his assertions, the new statutes [i.e., Senate Bills 1437 and 775] essentially insert 'omitted element' error into this record," although the Attorney General argues the error was harmless. We agree any error was harmless.

a. *The Framework for Determining Whether There Was Error and, If So, Whether the Error Was Prejudicial*

When a trial court instructs on a theory of guilt that "is legally erroneous at the time it was given," a reviewing court "normally assess[es] whether the error was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24. [Citation.] We 'must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt.' " (*Gentile*, *supra*, 10 Cal.5th at p. 851.) The *Chapman* standard applies both to "alternative-theory error" (i.e., instruction on multiple theories of guilt, one of which is legally erroneous) and to other errors involving the omission or misdescription of elements of a charged offense. (*People v. Aledamat* (2019) 8 Cal.5th 1, 3, 9 (*Aledamat*).)[22]

_____

[22] Birdsall briefly suggests that a different or higher standard applies in the context of alternative-theory error, and that reversal is required here unless this court can determine beyond a reasonable doubt that the jury based its verdict on the legally valid theory of malice-premeditation, rather than the allegedly invalid felony-murder theory. Our Supreme Court rejected this view in *Aledamat*, holding "that no higher standard of review applies to alternative-theory error than applies to other misdescriptions of the

Here, of course, Birdsall does not contend the felony-murder instruction given at his 2015 trial was legally erroneous "at the time it was given." (*Gentile*, *supra*, 10 Cal.5th at p. 851.)  He argues the instruction is erroneous in light of Senate Bill 1437's changes to the law of murder (specifically, §§ 188 and 189), which took effect on January 1, 2019.  As noted, prior to the enactment of Senate Bill 775, such claims could only be presented by filing a section 1170.95 petition in the sentencing court.  (*Gentile*, *supra*, 10 Cal.5th at pp. 851–852.)  But now, pursuant to Senate Bill 775, a person in Birdsall's situation (i.e., a person whose murder conviction is not final) may contend on direct appeal that the conviction is invalid based on Senate Bill 1437's changes to the law of murder.  (§ 1170.95, subd. (g), as amended by Stats. 2021, ch. 551, § 2.)

We agree with the parties that, in light of Senate Bill 775, an appropriate method for analyzing Birdsall's claim in this direct appeal is to include Senate Bill 1437's changes to the law of murder as part of the body of law against which the correctness of the trial court's felony-murder instruction is measured.  If the instruction omitted or misdescribed the elements that now must be proven to establish felony murder as a basis for a first degree murder conviction, we will treat the instruction as having been "legally erroneous at the time it was given" (*Gentile*, *supra*, 10 Cal.5th at p. 851),[23] and we will proceed to "assess whether the error was harmless

---

elements." (*Aledamat*, *supra*, 8 Cal.5th at p. 9; *id.* at p. 13 ["An examination of the actual verdict may be sufficient to demonstrate harmlessness, but it is not necessary."].)

[23] See *People v. Chun* (2009) 45 Cal.4th 1172, 1201, footnote 8 ("When we say the trial court erred, we mean, of course, only in light of our reconsideration of past precedents.  As of the time of trial, . . . , ample authority supported the trial court's decision to instruct on felony murder.").

beyond a reasonable doubt" under *Chapman*. (*Gentile*, *supra*, at p. 851; *Aledamat*, *supra*, 8 Cal.5th at p. 9; see *People v. Hola*, *supra*, ___ Cal.App.5th ___ [2022 Cal.App.LEXIS 303, at p. *22 & fn. 14] [reversal may be warranted "when there is a change in the law during an appeal that invalidates a previously valid legal theory relied upon by prosecution," but "[r]eversal would not be warranted where the error is harmless beyond a reasonable doubt"].)

   b. *The Alleged Error*

  As to the alleged error here, Birdsall contends the court's instruction was defective because it did not state the rule in section 189, subdivision (e) (added by Senate Bill 1437) that a participant in an enumerated felony in which a death occurs is liable for murder "only if *one of the following* is proven": (1) "[he] was the actual killer," (2) "[he] was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree," *or* (3) "[he] was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e), italics added.)

  We note initially that the statute sets forth three *alternative* bases for imposing felony murder liability, only some of which might be appropriately included in an instruction in a given case, depending on the evidence presented and the theories pursued by the prosecution. (§ 189, subd. (e) ["one of the following" must be proven]; see CALCRIM Nos. 540A, 540B [allowing presentation of fewer than all theories of liability].) To the extent Birdsall suggests that *all three* of these separate grounds for conviction are "essential elements" that must be included in a felony-murder instruction, we disagree. But he is correct that the felony-murder instruction given at his trial (CALCRIM No. 540A) did not present, in the current language of the statute,

49

any of the three grounds that can now form the basis for a felony-murder conviction.

CALCRIM No. 540A as given by the court did state that, to convict Birdsall of felony murder, the jury had to find that, "[w]hile committing or attempting to commit burglary or robbery, *the defendant caused the death of another person*." (Italics added.) We need not address the parties' arguments (which they present indirectly as part of their discussion of prejudice) about whether this or similar language sufficiently conveys the current rule that a defendant may be guilty of felony murder if he is "the actual killer."[24] (§ 189, subd. (e)(1); see *People v. Garcia* (2020) 46 Cal.App.5th 123, 149, 155 [prosecutor argued felony-murder special circumstance should apply to defendant as an "actual killer" if he handed a roll of duct tape to a coperpetrator; appellate court held the instruction on the special circumstance (CALCRIM No. 730) should have required that "the prosecution prove[] beyond a reasonable doubt that [the defendant] '*personally killed*' [the victim]," rather than requiring "only that the prosecution . . . prove that [the defendant] '*did an act that caused the death* of another person,' " italics added] (*Garcia*).)[25] Even assuming the challenged instruction did not

---

[24] As noted, the court did not instruct on the alternative theory that a coparticipant in the underlying felony caused the victim's death (CALCRIM No. 540B). That instruction has since been modified to describe the grounds for felony-murder liability for nonkillers, i.e., that the defendant acted with the intent to kill and aided the commission of first degree murder, or was a major participant in the underlying felony who acted with reckless indifference to human life. (§ 189, subd. (e)(2)–(3); see CALCRIM No. 540B, as revised Apr. 2020 and Sept. 2020; see also CALCRIM No. 540C, as revised Apr. 2020 [felony murder where victim's death resulted from "other acts"].)

[25] We note the current versions of CALCRIM Nos. 540A (felony murder as a basis for a first degree murder conviction) and 730 (felony-murder special circumstance), like the versions of these instructions that were given

sufficiently convey this rule (or the other alternative bases for imposing felony murder liability under current law), we conclude below that the error was harmless beyond a reasonable doubt.

####  c. *Prejudice*

As noted, applying the *Chapman* standard to the alleged instructional error here, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, [we] determine[] the error was harmless beyond a reasonable doubt." (*Aledamat*, *supra*, 8 Cal.5th at p. 13.) In *Merritt*, our Supreme Court applied the *Chapman* standard where the trial court failed to instruct on several elements of the charged crime of robbery. (*Merritt*, *supra*, 2 Cal.5th at pp. 822, 824–825, 831–832; see *Aledamat*, *supra*, at p. 9.) The *Merritt* court found the instructional error harmless based on several circumstances, including that defense counsel conceded the two charged robberies occurred (contesting only the defendant's identity as the perpetrator); there was overwhelming evidence the robberies occurred; and the jury was properly instructed on, and resolved, several key issues, including the defendant's identity as the perpetrator, and that he acted with the required mental state for robbery and used a firearm during the offense. (*Merritt*, *supra*, 2 Cal.5th at pp. 831–832.)

Similarly, here, we conclude the alleged instructional error was harmless. As discussed, under current law, a proper ground for a conviction of felony murder is that Birdsall "was the actual killer." (§ 189, subd. (e)(1).) It is clear beyond a reasonable doubt that a rational jury would have adopted

---

at Birdsall's trial, include as an element that the defendant "caused," or "did an act that caused," "the death of another person." (CALCRIM No. 540A, as revised Sept. 2019; CALCRIM No. 730, as revised Mar. 2021.)

this theory, and thus would have found Birdsall guilty of felony murder, even absent the purported error. (*Merritt, supra*, 2 Cal.5th at pp. 827, 831.)

Birdsall's trial counsel stated at the outset of her closing argument that she was "not contesting that Ms. Latiolais was killed, the manner in which she was killed, what happened." Counsel stated she was "only here to talk to you about why it happened, and what was going on in Christian Birdsall's mind"; as noted, counsel argued Birdsall was in a dissociated state and did not form the required mental states for conviction. Counsel's decision not to contest the prosecution's account of how Latiolais was killed was virtually compelled by the overwhelming evidence on that point in the form of Birdsall's confession, in which he described in detail how he and Nicosia assaulted and strangled Latiolais.[26]

" '[W]here a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless.' " (*Merritt, supra*, 2 Cal.5th at p. 832, quoting *Neder v. United States* (1999) 527 U.S. 1, 17.) In light of the overwhelming and uncontested evidence as to how Latiolais was killed (by an attack in which Birdsall and Nicosia used chokeholds and then jointly strangled her to death with a rope), we are persuaded beyond a reasonable doubt that a rational jury instructed under current law would have found Birdsall was "the actual killer" (§ 189,

---

[26] In his supplemental brief on the Senate Bill 1437 issue, Birdsall reiterates his argument that his confession should have been suppressed, and he suggests the confession therefore should not be considered in assessing whether the alleged instructional error was prejudicial. We have concluded in part II.A., *ante*, that the confession was properly admitted.

subd. (e)(1)), because he and Nicosia " 'personally killed' " Latiolais. (*Garcia*, *supra*, 46 Cal.App.5th at pp. 151–152.)[27]

Birdsall asserts in a footnote that the evidence here "does not necessarily establish that Birdsall, as opposed to [Nicosia], killed Latiolais." We are not persuaded by this undeveloped argument. As discussed, based on Birdsall's own uncontested account of the murder, we conclude beyond a reasonable doubt that a rational jury would have found Birdsall (along with Nicosia) personally killed Latiolais. (See *Garcia*, *supra*, 46 Cal.App.5th at p. 150 ["under the facts of this case, only *the person (or people)* who placed the duct tape on [the victim's] mouth were actual killers" (italics added) under the special circumstance statute, § 190.2].)

Also of significance here, the court correctly instructed on the remaining elements of felony murder. The court instructed that, to find Birdsall guilty of first degree murder on a felony-murder theory, the jury had to find (1) he "committed or attempted to commit burglary or robbery," (2) he "intended to commit burglary or robbery," and (3) "[w]hile committing or attempting to commit burglary or robbery, [Birdsall] caused the death of another person." The court also instructed on the elements of burglary and robbery and on attempt. To adopt the felony-murder theory of first degree murder, the jury would have had to find these elements to be true. (See *Merritt*, *supra*, 2 Cal.5th at p. 832 [proper instructions and findings on

---

[27] Because the jury would have found Birdsall guilty of felony murder as an actual killer, we need not consider the parties' arguments as to whether the jury also would have found him guilty on one of the *alternative* grounds permitted under current law (i.e., as a direct aider and abettor of first degree murder who had the intent to kill, or as a major participant in the underlying felony who acted with reckless indifference to human life). (§ 189, subd. (e)(2)–(3).) We also need not address the parties' arguments as to whether the alleged error was harmless on other grounds.

contested elements supported conclusion that omission of other elements was harmless].)

In his supplemental appellate brief, Birdsall emphasizes that, at trial, his mental state (including whether he acted with malice) *was* a contested issue. But that does not affect our conclusion the jury would have found Birdsall liable as an actual killer under current law. Under sections 188 and 189 as amended, if a death occurs during a burglary or a robbery, an actual killer is guilty of first degree felony murder without the need to prove he acted with express or implied malice. (§§ 188, subd. (a)(3) ["Except as stated in [§ 189, subd. (e)]," malice is now required for a murder conviction], 189, subd. (e)(1) [actual killer is liable if death occurs during specified felony].)

We also note that, as to the mental state element that the prosecution did have to prove, i.e., that Birdsall intended to commit burglary or robbery, the court instructed on that point, and the jury found it to be true, as reflected in the true findings on the felony-murder special circumstances. It is clear the jury rejected the defense view that, due to dissociation, Birdsall did not form those mental states.[28]

## D. *Cumulative Prejudice*

Birdsall argues in his supplemental brief that reversal is required due to cumulative prejudice flowing from (1) the allegedly erroneous admission of his confession, and (2) the failure to instruct on the post-Senate Bill 1437 elements of felony murder. We have concluded in part II.A., *ante*, that

---

[28] In addition, although it is not necessary to our conclusion as to prejudice, the Attorney General correctly notes the jury's true finding on the lying-in-wait special circumstance establishes the jury found Birdsall acted with the intent to kill. The instruction on the lying-in-wait special circumstance (CALCRIM No. 728) required the jury to find Birdsall "intentionally killed" Latiolais and that he "intended to kill [Latiolais] by taking [her] by surprise."

Birdsall's confession was properly admitted, and in part II.C., *ante*, that the purported instructional error was harmless. There are not multiple errors here that could combine to support a claim of cumulative prejudice.

### III. DISPOSITION

The judgment is affirmed.

STREETER, Acting P. J.

WE CONCUR:

BROWN, J.
ROSS, J.[*]

---

[*] Judge of the Superior Court of California, County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:     Superior Court of California, County of Alameda

Trial Judges:    Hon. Rhonda Burgess and Hon. Jon Rolefson

Counsel:         Waldemar D. Halka, by appointment of the Court of Appeal
                 Under the First District Appellate Project, for Defendant
                 and Appellant.

                 Rob Bonta, Attorney General, Matthew Rodriquez, Acting
                 Attorney General, Lance E. Winters, Chief Assistant
                 Attorney General, Jeffrey M. Laurence, Senior Assistant
                 Attorney General, Donna M. Provenzano, Supervising
                 Deputy Attorney General, David H. Rose, Deputy
                 Attorney General, for Plaintiff and Respondent.